IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

<table>
<tr><td>

TINA VU,
       *Plaintiff*,

v.

MICHELLE L. KOTT et al,
       *Defendants*.

</td><td>

Civil No. 23-3336

</td></tr>
</table>

**MEMORANDUM**

COSTELLO, J.                                                    **March 5, 2026**

Plaintiff Tina Vu has sued the City of Bethlehem and several individual police officers in connection with her termination from her employment as a police officer.  She alleges sex discrimination under Title VII, a Fourteenth Amendment due process violation, and supervisory liability.  Defendants have moved for summary judgment.  For the reasons stated below, the Court will grant the Defendants' motion.

I.      FACTUAL BACKGROUND

A.      Vu's Initial Interview and Hiring

Seeking to serve as a police officer for the City of Bethlehem (the "City"), Vu participated in an employment interview with Deputy Chief Scott Meixell ("Meixell") in May 2020.  ECF No. 49 ¶ 16.  During the interview, Meixell, a defendant in this case, noted that Vu was a "smaller statured female" and asked how she would handle herself if somebody much larger resisted arrest.  *Id*. ¶ 18.  Meixell asked the question because he wanted to know whether Vu was "confident enough to deal with what's in front of" her.  *Id*. ¶ 19.  Vu "gave a response that was completely satisfactory" and Meixell concluded that Vu was qualified to serve as a police officer.  *Id*. ¶¶ 17, 19.  The City extended an offer of employment to Vu on June 4, 2020,

and she began her employment on or about June 15, 2020 as a probationary employee. *Id*. ¶¶ 26-27, 29. Vu never complained about or reported Meixell's comment about her physical stature or his question about her ability to handle a larger person to the City or to anyone at the police department. *Id*. ¶ 20.

**B.     The September 26, 2021 Incident**

On September 26, 2021, Vu and other officers were dispatched to a bar to respond to a report of a fight. ECF No. 49 ¶¶ 45-46. While there, Vu encountered two separate but related incidents. *Id*. ¶ 46. First, Vu encountered a woman who reported that she was punched in the face. *Id*. ¶ 47. The woman identified a male who was responsible for the assault. *Id*. Second, Vu encountered that same male as he was about to engage in a physical altercation with another person. *Id*. ¶ 48.

After dealing with the first incident, Vu and Sergeant Bradford Jones approached the scene of the second incident, which involved several people. *Id.* ¶ 48. Sgt. Jones instructed Vu to draw her taser. *Id.* ¶ 49. Instead, Vu drew her firearm and lasered (*i.e.*, pointed the firearm at) one of the individuals present at the scene (the "Subject"). *Id*. ¶ 50. When Vu realized she had drawn her firearm, she uttered "oof," quickly re-holstered her firearm, and pulled out her taser. *Id*. ¶ 52; Ex. J at 13:44-13:48. Vu then pointed the taser at the Subject's face, neck, and chest. ECF No. 49 ¶ 53; Ex. J at 13:48-13:52. The Subject fled, and Vu attempted to tase him as she pursued him but failed. *Id*. at 13:49-13:58. Another officer tackled the Subject and handcuffed him. *Id*. at 14:32-15:00.

When asked for identification, the Subject presented a fake ID, likely because his real ID was suspended. *Id*. at 27:15-27:30, 29:15-29:30. After the Subject was processed and released, Vu gave him back the fake ID. ECF No. 49-1 at 86; Pl.'s First Interview, Ex. N, at 40:20-40:55.

### C.    Vu's Report About the Incident

Vu began her report about the incident a few hours later.  ECF No. 49-1 at 87.  After viewing her body camera footage, Vu added a short narrative to her report.  *Id*. at 88.  In this initial narrative, Vu stated, "I was instructed by Sgt. Jones to get out my taser.  I drew out my taser. . . . I instructed the male to stop, but he did not.  I yelled my commands, "Taser, Taser" and deployed one of my cartridges."  *Id.* at 95.  Vu did not mention drawing her firearm in her initial report.  Later that day, while Vu was off duty, she viewed her body camera footage again.  *Id.* at 87.

During her next shift, Vu viewed her report and Sgt. Jones' report.  *Id*. at 88.  She then changed the narrative of her report to omit Sgt. Jones' instruction to draw her taser.  *Id*. at 97.  She also added that when she approached the scene, she heard unidentified people yelling "He's got a knife!  He's got a knife!"  *Id*.  Vu reported that she drew her firearm "due to comments that were made" and that she "confirmed that the scene was safe prior to re-holstering."  *Id*.  She claimed she then drew "her taser due to the active fist fight[.]"  *Id*.  Minutes after deleting Sgt. Jones' instruction from her narrative and adding that she heard people yelling "knife" at the scene, Vu changed the supervisor from Sgt. Jones, who was present at the scene, to Sergeant Jeffrey Lutte, who was not.  *Id*.  Vu continued to view and edit her report throughout her shift.  *Id.* at 88-89.

During the next shift, on September 28, 2021, Sgt. Lutte rejected Vu's report.  *Id*.  Vu made changes and resubmitted the report, which Sgt. Lutte then approved.  *Id.* at 89.  After Sgt. Lutte approved her report, Vu continued to view her report and her body camera footage.  *Id*.

**D.      The Internal Investigation**

On September 29, 2021, Meixell asked Sergeant Kevin Conrad and Sergeant Joshua Schnalzer, both of whom are defendants in this case, to investigate Vu's use of force during the September 26, 2021 incident.  *Id*. at 82.  As part of the investigation, Sgt. Schnalzer interviewed Vu on October 1, 2021.  ECF No. 49 ¶ 68.  Sgt. Conrad, and Robert Corsi, President of the Fraternal Order of Police ("FOP"), were present for the interview.  *Id.*  Among other things, Sgt. Schnalzer asked Vu for more information about her claim that she heard someone yelling "knife" before she drew her firearm.  Ex. N at 14:30-14:50.  Vu repeated her claim that she heard yelling about a knife as she approached the scene of the incident.  *Id*. at 15:17-15:35.  Vu further stated that she later confirmed with Sgt. Jones that he also heard yelling about a knife.  *Id.*  This was not true.  Interviewed separately, Sgt. Jones reported that he did not hear anyone yelling about a knife as they approached the scene.  Jones' Interview, Ex. U, at 40:00-40:10, 41:30-42:02.  Moreover, Vu's body camera footage, which captured Vu drawing her firearm, exclaiming "oof," and then drawing her taser, did not capture any yelling about or mention of a knife.  *See* Ex. J at 13:36-13:46.

Regarding her use of force, Vu stated that she had her hand on her firearm when Sgt. Jones told her to get her taser.  Ex. N at 17:34-17:39.  She then pulled out her firearm and lasered the Subject before reholstering the firearm and drawing her taser.  *Id*. at 17:40-17:55.  Vu acknowledged pointing her taser at the Subject's face, neck, and chest.  *Id*. at 31:20-32:00.  Vu said she did not remember if drawing her firearm was intentional or accidental.  *Id*. at 18:30-18:35.  Sgt. Schnalzer reminded Vu that her report said that she intentionally drew her firearm.  *Id*. at 18:37-18:47.  Vu said she did not recall if she drew her firearm intentionally, but she knew she accidentally lasered the Subject, causing her to "verbally react" by uttering "oof."  *Id*. at

19:40-20:00, 20:20-20:30.  Vu acknowledged that "lasering the guy" was a "mistake."  *Id*. at 38:40-38:50.

On October 5, 2021, Sgt. Schnalzer interviewed Vu a second time with Captain Benjamin Hackett, another defendant, and FOP President Corsi present.  ECF No. 49 ¶ 75.  This time Vu was sure that she intentionally pulled her firearm in response to hearing yelling about a knife.  Pl.'s Second Interview, Ex. O, at 08:15, 27:25, 28:36.  Vu continued to acknowledge that she pointed her firearm at the Subject.  *See* Pl.'s Second Interview, Ex. O, 10:00, 27:50-28:10, 28:36, 29:43, 29:51.  Vu outlined her thoughts in the moments after she pulled her firearm, explaining "And then I'm like, 'okay well … I don't see anything,' I'm like 'I just lasered this guy.' I'm like, 'shit, I messed up.'"  *Id*. at 28:00-28:15.  Vu did not talk to Sgt. Jones about drawing her firearm or lasering the Subject because she knew she "made a mistake," and was "trying to get the courage to go talk to [her] Sergeant" about it.  *Id*. at 21:30-22:05.

At the conclusion of the investigation, Sgt. Schnalzer concluded that Vu "made a number of serious mistakes and many less serious mistakes during the course of this event."  ECF No. 49-1 at 91.  Her most serious mistake "was the unholstering and pointing of her firearm at a time when she knew, or should have known, this use of force was unnecessary."  *Id.*  Although Vu eventually claimed that she pulled her firearm in response to yelling about a knife, Sgt. Schnalzer found no independent evidence supporting her claim.  *Id*.

Sgt. Schnalzer further found that Vu tried to "keep the unholstering and pointing of her firearm from being discovered."  *Id*.  Among other things, Sgt. Schnalzer noted that in her initial report about the incident, Vu failed to mention that she drew her firearm.  *Id.*  Vu's use of force report similarly failed to mention a firearm.  *Id.*  In addition, after Vu edited her report to include the fact that she drew her firearm, Vu failed to mention that she pointed her firearm directly at

the Subject. *Id.* Vu also failed to notify any supervisor that she pointed her firearm at the Subject, and she sent her report to an uninvolved supervisor for review. *Id.* Vu also appeared to have intentionally uploaded her body worn camera footage with an erroneous report number. *Id.* at 92. This could have prevented the video footage from being found through computer searches run by the incident report number. *Id.* During her second interview, Vu acknowledged that she was aware that the report number was wrong, but she had taken no steps to fix it. *Id.* Sgt. Schnalzer also mentioned Vu's repeated viewings of her report and her body worn camera footage and noted that Vu "indisputably had seen the portion of the video in question," which disputed her version of events, yet "took no steps to make corrections in her report or bring her mistakes to light." *Id.* Sgt. Schnalzer also outlined multiple less serious administrative and procedural failures by Vu, including returning the Subject's fake ID to him after the incident. *Id*. at 86-7, 90.

Sgt. Schnalzer sent his findings and conclusions in an inter-office memorandum to Meixell and Chief Michelle Kott, also a defendant in this case. ECF No. 49-1 at 82.

### E.    Vu's Termination

While the investigation was ongoing, Chief Kott had Vu begin remedial training. ECF No. 49 ¶ 87. After the investigation was complete, Chief Kott reviewed Sgt. Schnalzer's memorandum and the recorded interviews and decided to terminate Vu's employment based on her violations of multiple police department directives. ECF No. 49-1 at 110; ECF No. 49 ¶ 88. To Chief Kott, Vu's conduct after the incident and during the investigation reflected poorly on Vu's integrity. ECF No. 49 ¶ 90; Kott Dep., ECF No. 49-1 at 111. Termination was therefore necessary because Chief Kott did not believe she could "retrain somebody's integrity." *Id.*

6

Meixell spoke to Vu about the decision.  ECF No. 49-1 at 48.  Among other things, Meixell expressed concern for Vu's safety because she did not perform at a level that police department leadership thought was adequate.  *Id.* at 48-49.  Meixell cited Vu's poor decision-making in the face of what was essentially a street fight.  *Id.*  Among other errors, Vu "drew her firearm and pointed to the person when it wasn't warranted," putting herself and the other person in danger.  *Id.* at 49.

On October 14, 2021, the City held a name-clearing hearing to allow Vu to refute the allegations against her.[1]  Vu, Chief Kott, Meixell, Human Resources Director Michelle D. Cichocki, another defendant in this case, and an FOP representative were present for the hearing. ECF No. 19 ¶ 122; ECF No. 36 ¶ 122.  The City terminated Vu's employment that same day, while Vu was still a probationary employee.  ECF No. 49 ¶¶ 29, 96.

### F.      Post-Termination

In May or June 2022, shortly before the start of a trial in which Vu could have been called to testify, an Assistant District Attorney ("ADA") from the Northampton District Attorney's Office ("DA's Office") asked the police department for the memorandum detailing the internal investigation into Vu's conduct.  ECF No. 49-1 at 112; ECF No. 49 ¶ 102.  The DA's Office made the request in compliance with the requirements of *Brady v. Maryland*, 373 U.S. 83 (1963) (holding that the prosecution must disclose all material, exculpatory evidence to the defense) and *Giglio v. United States*, 405 U.S. 150 (1972) (extending the disclosure requirement to evidence that could be used to impeach the credibility of government witnesses).  *Id.*  As requested, Chief

---

[1]      Such hearings are commonly referred to as *Loudermill* meetings.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) (holding that public employees with a property interest in their jobs are entitled to pre-termination notice and an opportunity to respond to the charges against them).

Kott sent Vu's termination letter and the investigation report to the ADA.  ECF No. 49 ¶¶ 102, 103, 105.

On June 6, 2022, Vu received notice that the DA's Office had placed her on the "Disclosure List" based on the findings of the investigation that Vu had falsified police reports and attempted to conceal her actions during the September incident.  *Id.* ¶ 104; ECF No. 49-1 at 116.  Placement on the Disclosure List meant that Vu's misconduct would have to be disclosed to the defense in any criminal case in which Vu was involved.  ECF No. 49-1 at 116.  Vu had thirty days to request reconsideration of her placement on the Disclosure List and otherwise had the ability to seek review of her placement on the list once every two years.  ECF No. 49-1 at 120.  Vu did not request reconsideration or seek review of her placement on the list for more than three and a half years.  ECF No. 49 ¶ 110-112.[2]

## II.    PROCEDURAL HISTORY

Vu filed this lawsuit on August 28, 2023.  ECF No. 1.  After Defendants moved to dismiss the Complaint, Vu filed an Amended Complaint.  ECF Nos. 15, 19.  Her Amended Complaint presented nine causes of action, and Defendants again moved to dismiss.  ECF No. 22.  On May 31, 2024, the Honorable John M. Gallagher granted the motion in part and denied it in part, dismissing some counts without prejudice.  ECF No. 32.  After that ruling, the following claims remained: sex discrimination under Title VII (Count III), a Fourteenth Amendment due process violation as it pertains to a liberty interest in reputation (Count V), and supervisory liability regarding Chief Kott (Count VIII).  ECF Nos. 31, 32.  Defendants moved for summary judgment on all three remaining claims.

---

[2]    Years after she filed this action—after discovery was closed and summary judgment was fully briefed and argued—Vu filed an affidavit attaching a letter from the DA's Office dated February 18, 2026, rescinding Vu's placement on the Disclosure List.  ECF No. 77-1 at 2.

## III.    LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if it "might affect the outcome of the suit," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

The movant bears the initial responsibility of identifying the portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Then, the nonmovant must "set forth specific facts showing there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv*., 214 F.3d 402, 407 (3d Cir. 2000). Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

In ruling on a summary judgment motion, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009) (citation and quotation marks omitted). The court does not make credibility determinations or weigh the evidence. *See Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a

9

court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Where a defendant moves for summary judgment based on a lack of proof of a material fact, the court must ask "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. If a plaintiff fails to establish one or more essential elements, "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323-24. "If Plaintiff fails to raise a genuine dispute of material fact as to any element of his prima facie case, summary judgment in favor of Defendant is warranted." *Hanafy v. Hill Int'l, Inc.*, 669 F. Supp. 3d 419, 433 (E.D. Pa. 2023) (citing *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 580 (3d Cir. 1996)).

## IV.    DISCUSSION

### A.    Title VII – Sex Discrimination

Vu claims that the City and the individual defendants discriminated against her with respect to her termination on the basis of her sex. As an initial matter, the Court notes that "Congress did not intend to hold individual employees liable under Title VII." *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1077-78 (3d Cir. 1996) (*en banc*). Accordingly, Vu's Title VII claims against the individual defendants cannot proceed, and summary judgment is warranted.

Vu's Title VII sex discrimination claim against the City is subject to the three-step burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff must establish a prima facie case of sex discrimination. *Atkinson v. Lafayette Coll.*, 460 F.3d 447, 454 (3d Cir. 2006). If the plaintiff succeeds, the burden shifts to the

10

defendant to advance a legitimate, nondiscriminatory reason for the employment action. *Id*. If defendant does so, the burden shifts back to the plaintiff to prove that the nondiscriminatory explanation is merely a pretext for discrimination. *Id*.

### 1. Prima Facie Case of Sex Discrimination

To establish a prima facie case of sex discrimination, a plaintiff must show that "(1) [s]he is a member of a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination." *Darby v. Temple Univ.*, 216 F. Supp. 3d 535, 541 (E.D. Pa. 2016) (citing *McDonnell*, 411 U.S. at 802). A plaintiff may establish an inference of discrimination by pointing to "comparator evidence, evidence of similar . . . discrimination against other employees, or direct evidence of discrimination from statements or actions by [the plaintiff's] supervisors suggesting [discriminatory] animus." *Fennell v. Comcast Cable Communications Mgmt., LLC*, 628 F. Supp. 3d 554, 572 (E.D. Pa. 2022) (quoting *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. Dec. 13, 2010)).

Here, Vu has failed to establish a prima facie case of sex discrimination. It is undisputed that she is a member of a protected class, and that she suffered an adverse employment action. Defendants hired her to be a police officer, so they do not now dispute that she was qualified for the position she held. However, Vu's claim fails because no reasonable factfinder could conclude that her termination occurred under circumstances giving rise to an inference of discrimination.

Vu's Title VII claim is based on comments Meixell allegedly made during her termination meeting. In particular, Meixell expressed concern for Vu's safety because she did not perform at a level that police department leadership thought was adequate. Meixell Dep., ECF No. 49-1 at

11

48-49.  Meixell testified that he was referring to errors Vu made in her response to the September incident.  *Id.*  These comments relate to Vu's job performance.  They do not suggest discriminatory animus.

Vu asks the Court to view Meixell's comments at her termination meeting as a "restatement" of sexually discriminatory comments he allegedly made during her May 2020 employment interview.[3]  ECF No. 19 ¶ 31; ECF No. 52-1 at 36.  According to the Amended Complaint, Meixell allegedly stated during Vu's employment interview that women were not physically capable of serving as police officers and posed a potential threat to the safety of male officers due to their physical limitations.  ECF No. 19 ¶ 31.  While Vu repeatedly references these alleged comments in her opposition to the motion for summary judgment, she cites no record evidence that Meixell ever made any such comments except for her own deposition testimony.  ECF No. 52-1 at 7, 8, 36.

During her deposition, Vu initially did not recall Meixell making any such comments at her employment interview.  ECF No. 49-1 at 26-28.  She testified that she did not remember Meixell stating that women were not physically capable of serving as police officers.  *Id.* at 26.  She also testified that he did not say that female police officers were more at risk than male officers due to the dangerous nature and physical requirements of police work.  *Id.* at 27.  Later

---

[3]     Any discriminatory comments made during Vu's May 2020 interview cannot serve as an independent basis for Vu's Title VII claim.  Vu did not include the alleged comments in her March 23, 2022 complaint to the Pennsylvania Human Relations Commission ("PHRC").  ECF No. 49-1 at 122-159.  Indeed, Vu could not have timely raised the comments in that PHRC complaint.  An employee must file a charge with the PHRC within 300 days of the alleged discriminatory action.  Vu did not file a charge to the PHRC within 300 days of her March 2020 interview.  Therefore, she cannot recover for the alleged comments.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002) (noting that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges").  However, such comments may be used as background evidence to provide context for timely claims.  *Nat'l R.R. Passenger Corp.* 536 U.S. at 113.

in her deposition, after her attorney refreshed her recollection with the Amended Complaint, Vu

testified that Meixell had in fact stated that women, especially women of her size (5 feet, 1-inch-

tall and weighing 95 pounds), should not be police officers.  ECF No. 52-2 at 22.  No other

evidence supports Vu's allegation that Meixell made these comments.  Vu's testimony, without

more, is not sufficient to create a genuine issue of material fact.  *See Parham v. May*, No. 16-

6148, 2023 WL 5278143, at *6 (E.D. Pa. Aug. 16, 2023) (internal citations omitted).

That is not to say that Meixell did not question Vu's ability to serve as a police officer

during her employment interview.  All parties seem to agree that Meixell asked Vu how she

would handle an encounter with a larger person who was resisting arrest.  This comment, by

itself, does not suggest discriminatory animus.  Meixell's question pertained to Vu's general

ability to perform a material aspect of the job.  There is no evidence that the comment arose out

of animus toward Vu because she was female or animus toward female police officers in general.

Indeed, Meixell testified that he asked the question because he wanted to gauge whether Vu was

"confident enough to deal with what's in front of" her.  ECF No. 49 ¶ 19.  Apparently, Vu

answered the question to his satisfaction because she got the job, which would have been an odd

result if Meixell had said or believed that women could not effectively serve as police officers.

Vu also tries to establish an inference of discrimination by pointing to an alleged

comparator, a male colleague who was also a probationary employee.  Vu argues that this fellow

probationary employee became frightened during the September 26, 2021, incident and hid

behind a car.  She claims he was not investigated or fired and that she was treated more harshly

because of her sex.  Even taking Vu at her word, this former colleague is not a proper

comparator.  Comparators must be similarly situated in all material aspects.  *May v. PNC Bank*,

434 F. Supp. 3d 284, 297 (E.D. Pa. 2020).  "The two most important factors in assessing whether

13

an employee is similarly situated to a plaintiff alleging [ ] discrimination are the nature of the offenses perpetrated by the employees and the punishments imposed." *Id*. (citations omitted). Unlike the purported comparator, Vu was investigated because of her use of force during the September incident. ECF No. 49-1 at 82. She compounded her problems by failing to be forthcoming in her reporting of the incident and during the subsequent investigation. *Id.* at 82-92. Accordingly, the treatment of this former colleague does not establish an inference of discrimination with respect to Vu.

To establish an inference of discrimination, Vu must do more than raise unsupported assertions, restate allegations from her complaint, or rely on mere suspicions. Because she has not, she has failed to establish a prima facie case of discrimination.

### 2.        Nondiscriminatory Reason

Even if Vu could establish a prima facie case of sex discrimination, Defendants have articulated a legitimate, nondiscriminatory reason for her termination. A defendant's burden in this respect is light. "The employer need not prove that the tendered reason actually motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Mitchell v. City of Pittsburgh*, 995 F. Supp. 2d 420, 433 (W.D. Pa. 2014) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).

Defendants terminated Vu's employment based on "serious mistakes" she made during the September 26, 2021 incident and concerns about her integrity based on her dishonesty during the internal investigation. ECF No. 49-1 at 91. Vu's most serious mistake "was the unholstering and pointing of her firearm at a time when she knew, or should have known, this use of force was unnecessary." *Id.*

14

Vu compounded this mistake by failing to be truthful about her actions. Among other things, Vu claimed at one point that she pulled her firearm because she heard people yelling about a knife. Sgt. Schnalzer found no evidence supporting this claim and the video footage directly contradicts it. Sgt. Schnalzer further found that Vu tried to "keep the unholstering and pointing of her firearm from being discovered." *Id*. In both the initial draft of her report and in her use of force report, Vu failed to even mention that she drew her firearm. In addition, after Vu edited her report to include the fact that she drew her firearm, Vu failed to mention that she pointed her firearm directly at another person. Vu also failed to notify any supervisor that she pointed her firearm at a subject, and she intentionally sent her report to an uninvolved supervisor for review. Vu also appeared to have intentionally uploaded her body worn camera footage with an erroneous report number to make it difficult to find.

Based on these and other findings, Chief Kott determined that Vu's employment should be terminated. ECF No. 49-1 at 110; ECF No. 49 ¶ 88. Termination was necessary because, as Chief Kott testified, Vu's actions called her integrity into question. ECF No. 49 ¶ 90; ECF No. 49-1 at 111. If ever a police department had a legitimate, nondiscriminatory reason to fire a probationary officer, Vu's drawing of a firearm in response to a fistfight, lasering of a civilian in the process, and attempted concealment of her actions would be it.

### 3.    Pretext

Because Defendants have offered a legitimate, nondiscriminatory reason for Vu's termination, the burden shifts back to her to establish pretext. "At the summary judgment stage, an employee establishes pretext by showing 'some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or

15

determinative cause of the employer's action.'" *Mammen v. Thomas Jefferson Univ.*, 523 F. Supp. 3d 702, 719 (E.D. Pa. 2021) (quoting *Fuentes v. Borough of Watchung*, 286 F. App'x 781, 784-85 (3d Cir. July 24, 2008). To discredit the employer's reason, a plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason[ ] for its action that a reasonable factfinder could rationally find [it] 'unworthy of credence.'" *Fuentes v. Perskie*, 32 F.3d at 765. "To show that discrimination was more likely than not a cause for the employer's action, the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that [sex] was a motivating or determinative factor in the employment decision." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 (3d Cir. 1998) (citing *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1111 (3d Cir. 1997)).

Vu again argues that Meixell's question during her employment interview about her ability to handle herself and his stated concerns for her safety at the time of her termination prove that the Defendants' proffered nondiscriminatory reasons for terminating her were mere pretext. As is discussed fully above, Vu has provided no evidence that would cause a factfinder to disbelieve Defendants' proffered reason or to believe that Vu's sex was a motivating or determinative factor in her termination. Indeed, there is no evidence that anything other than Vu's policy violations and her attempted concealment of her mistakes led to her termination. Accordingly, Vu has failed to come forward with sufficient evidence to avoid summary judgment of her Title VII discrimination claim.

### B.    Due Process – Liberty Interest in Reputation

Vu claims that the Defendants violated her Fourteenth Amendment liberty interest in her reputation by sending Sgt. Schnalzer's October 11, 2021 memorandum detailing his investigation

16

of Vu's conduct to the DA's Office.  To establish this claim, a plaintiff must allege "(1) [s]he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to [her] did not provide 'due process of law.'"  *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir. 2006) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)).

The Due Process Clause does not protect reputation alone.  *Hill*, 455 F.3d at 236 (internal citation omitted).  "[T]o make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to h[er] reputation *plus* deprivation of some additional right or interest."  *Id*. (internal citation omitted).  This is known as the stigma-plus test.  *Id*.  "The creation and dissemination of a false and defamatory impression is the 'stigma,' and the termination is the 'plus.'"  *Id*.  Vu was terminated, so she likely satisfies the "plus" prong.  To satisfy the "stigma" prong, Vu must show the publication of a substantially and materially false statement that infringed upon her "reputation, honor, or integrity."  *See Ersek v. Springfield*, 102 F.3d 79, 83-84 (3d Cir. 1996).  Vu has not satisfied the "stigma" prong.

First, Vu has failed to show evidence of any materially false statement.  During oral argument, Vu suggested that this claim related to her placement on the "Disclosure List" following the internal investigation that led to her termination.  Vu has failed to point to any evidence that the findings of that investigation were false.  There is no question that she disputes the findings, but she must do more than that.  She must come forward with evidence from the record that the findings were materially false.  She has not done so.[4]

---

[4]   After discovery was closed and summary judgment was fully briefed and argued, Vu filed an affidavit attaching a letter from the DA's Office rescinding her placement on the Disclosure List.  ECF No. 77-1 at 2.  This late-arriving affidavit does not change the Court's analysis.  It is worth noting that the DA's Office considered a record that was curated solely by Vu and that omitted information considered by Sgt. Schnalzer, including the recordings of Vu's contradictory

Second, Vu has failed to identify a publication.  It is undisputed that the memorandum detailing the internal investigation was sent to the DA's Office consistent with the constitutional requirements governing prosecutors' discovery obligations.  There is no evidence that the memorandum was disclosed to anyone else, such as a defense attorney or a member of the public.  Vu fails to explain how transmission of the memorandum to the DA's Office equates to a publication.  She has not identified any record evidence or legal authority supporting her argument.  Accordingly, Vu has failed to establish the "stigma" prong.

Even if she had, the record evidence establishes that Vu received adequate due process.  Specifically, Vu received a name-clearing hearing in the form of a *Loudermill* meeting.  Such a meeting serves as an "initial check against mistaken decisions" by providing the employee notice and an opportunity to respond.  *Loudermill*, 470 U.S. at 546.  This name-clearing meeting, as well as the opportunity available to Vu to seek reconsideration of her placement on the Disclosure List, satisfies the requirements of due process.  Therefore, Vu's due process claim fails, and summary judgment is appropriate.

## C.    Supervisory Liability – Chief Kott

Vu brings a supervisory liability claim against Chief Kott under § 1983, arguing that Chief Kott's authorization of Vu's termination, participation at the *Loudermill* meeting, and subsequent transmission of the inter-office memorandum to the DA's Office violated Vu's rights.  A supervisor may be liable under § 1983 if he or she has personal involvement in the conduct that allegedly violated plaintiff's rights.  *See Cannon v. City and Cnty. of Philadelphia*, No. 14-

---

interviews.  In any event, the letter, which appears to disagree with the findings of the investigation – albeit on an incomplete record – does not magically render those findings false.  Vu must do more than show that a third party disagrees with those findings.  She must present actual evidence of falsehood, which she failed to do.

18

5388, 2014 WL 7399037, at *3 (E.D. Pa. Dec. 30, 2014).  Importantly, a claim for supervisory liability requires an underlying constitutional violation.  *Zucal v. County of Lehigh*, 760 F. Supp. 3d 290, 304-05 (E.D. Pa. 2024) (recognizing that underlying constitutional violation is a "necessary element" of supervisory liability claim).

Vu has not pointed to any evidence of an underlying constitutional violation.  As is detailed above, Vu was not terminated for a discriminatory reason and her termination and temporary placement on the Disclosure List did not violate Vu's due process rights.  Accordingly, Defendants are entitled to summary judgment on this claim.  *See Zucal*, 760 F. Supp. 3d at 304-05 (granting summary judgment where "Plaintiffs' claims of supervisory liability fail because they have not established an underlying constitutional violation").

## V.    CONCLUSION

Vu has not pointed to record evidence to allow a jury to rationally find in her favor.  Accordingly, there is no genuine dispute as to any material fact, and Defendants are entitled to judgment as a matter of law.  The Court will therefore grant Defendants' motion for summary judgment.  An appropriate Order follows.

**BY THE COURT:**

MARY KAY COSTELLO, J.

19